DECISION
Relator, Wanda Searles, commenced this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying her permanent total disability ("PTD") compensation and enter an order granting said compensation.
Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In that decision, the magistrate found that the commission's non-medical analysis seemed to be premised, at least in part, upon relator's failure to participate in rehabilitation efforts since her original work injury in 1992. The magistrate noted that the commission treated this factor as weighing against the granting of PTD without any evidence of why relator had not participated in rehabilitation. The magistrate could not tell if this failure to rehabilitate was a separate basis, which the commission utilized for the PTD denial. The magistrate concluded that, because it could not tell what weight was given to relator's failure to rehabilitate, the commission's entire non-medical analysis was flawed. Accordingly, the magistrate recommended a writ be issued to vacate the commission's order denying PTD and ordering the commission to enter a new order, either granting or denying relator's PTD request, in a manner consistent with the decision.
The commission filed an objection to the magistrate's conclusions of law. In the objection, the commission argues that, even without the evidence of non-participation in rehabilitation, there remains other evidence sufficient to warrant the denial of relator's PTD compensation and that, even if the rehabilitation evidence was improperly considered, that does not render the commission's entire non-medical analysis flawed.
Following an independent review pursuant to Civ.R.53, we find the commission's objection well-taken and, therefore, we sustain it. PTD is the inability to engage in sustained remunerative employment and should be allowed only where there is no possibility of re-employment. State ex rel. Gemind v. Indus. Comm. (1998), 82 Ohio St.3d 457, 460; State ex rel. B.F. Goodrich Co. v. Indus. Comm. (1995), 73 Ohio St.3d 525. There are two components to a review of a PTD denial: (1) some evidence of a medical capacity for some sustained remunerative employment; and (2) an adequate analysis of claimant's non-medical factors. State ex rel. Roy v. Indus. Comm. (1998), 83 Ohio St.3d 199, 203. The commission's medical analysis in this case is not at issue. What is at issue is the commission's reliance of relator's non-participation in rehabilitation as non-medical grounds for the PTD denial.
The commission may state separate, alternative grounds for denial of PTD. State ex rel. Speelman v. Indus. Comm. (1992), 73 Ohio App.3d 757. If the commission does choose to use alternative grounds, "those grounds should not be merged together and should be explained separately so that a reviewing court can understand what has been done." Id. at 761. The commission's decision, in separate paragraphs, details the grounds utilized to deny relator's PTD application. One basis for the denial of PTD was relator's failure to participate in rehabilitation. But the commission also focused on factors that would be assets for relator in obtaining employment. Although the commission did not expressly state that these were all separate reasons for denial, the decision did explain the grounds separately, thereby allowing this court to properly review that decision.
Even if the commission improperly weighed relator's failure to participate in rehabilitation, we find that there was other evidence in the record to support the commission's decision to deny relator's PTD application. State ex rel. Lampkins v. Dayton Malleable, Inc. (1989),45 Ohio St.3d 14, 15 (noting that, if "some evidence" supports the commission's findings, there has been no abuse of discretion and mandamus will not lie). The commission noted relator's young age, her math and reading ability, her learning ability, and her ability to obtain semi-skilled positions as factors that would assist her in obtaining employment. The commission also relied upon certain portions of an employability assessment report drafted by a vocational expert for the commission. This report concluded that relator could perform sustained remunerative employment. All of these factors constitute some evidence that supports the commission's decision to deny PTD.
Therefore, we sustain the commission's objection to the magistrate's decision. We adopt the findings of fact contained in the magistrate's decision but not the conclusions of law. We further find that a writ of mandamus should not be issued because the commission did not abuse its discretion in denying relator's PTD application.
Objection sustained;
Writ of mandamus denied.
BRYANT and DESHLER, JJ., concur.
 IN MANDAMUS
In this original action, relator, Wanda Searles, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation and to enter an order granting said compensation.
Findings of Fact:
1. On November 10, 1992, relator sustained an industrial injury while employed as a machine operator for respondent Olan Plastics, Inc. The industrial claim is allowed for "right carpal tunnel syndrome; cervical strain; right lateral epicondylitis; major depression, single episode, severe without psychotic features" and is assigned claim No. 92-84699.
2. On September 25, 2000, relator filed an application for PTD compensation. In support of her application, relator submitted a report dated September 13, 2000, from her treating psychologist, Melessa A. Hunt, Ph.D. In her report, Dr. Hunt stated that she has been treating relator since February 8, 1996. Dr. Hunt opined:
 Given the unresolved physical problems related to the Industrial injury and the resultant aggravation of the depressive disorder originally allowed in her claim, Ms. Searles appears to be totally and permanently disabled as a result of her Industrial injury of 11/10/92. Within a reasonable degree of psychological and vocational certainty, Ms. Searles is incapable of performing any sustained remunerative employment. Negative vocational factors, in addition to the effects of her Industrial injury, include minimal work history (less than one year in lifetime), reduced educational background, and lack of transferable skills. She is not a feasible candidate for vocational rehabilitation.
3. On November 30, 2000, relator was examined, on the commission's behalf, by orthopedist, James Rutherford, M.D. Dr. Rutherford did not examine relator for her psychological claim allowance. Dr. Rutherford reported that relator could not return to her former position of employment as a "plastic[s] worker and machinist," but she is medically able to perform sustained remunerative employment. Dr. Rutherford estimated that relator's whole person impairment is eleven percent. He completed an Occupational Activity Assessment form which indicates that relator is limited to sedentary employment.
4. On November 30, 2000, relator was examined, on the commission's behalf, by psychologist, Earl F. Greer, Ed.D. Mr. Greer opined:
 The degree of emotional impairment from her industrial accident on 11-10-1992 would currently not be expected to solely prevent her from returning to her former position of employment. Work would be expected to be therapeutic, enhancing self-worth; and with significant unstructured time psychologically unhealthy. Motivation is expected to be a significant factor.
5. The commission requested an Employability Assessment report from John P. Kilcher, a vocational expert. The Kilcher report dated January 20, 2001, responds to the following query:
 Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform, (A) immediately and/or (B) following appropriate academic remediation.
Indicating acceptance of Dr. Rutherford's reports and responding to the above query, Kilcher wrote:
 * * * Based solely upon the restrictions identified by Dr. Rutherford in the medical report and Occupational Activity Assessment, the following jobs would be appropriate:
 Surveillance-System Monitor * * * Order Clerk, Food and Beverage; Call-Out Operator; and, Telephone Quotation Clerk.
 * * * Based solely upon the restrictions identified by Dr. Rutherford in the medical report and Occupational Activity Assessment report, the following entry level jobs would be suitable for the claimant in conjunction with on-the-job training:
 Appointment Clerk Monitor; Routing Clerk; Credit Authorizer; Credit Card Control Clerk.
Indicating acceptance of the Greer report and responding to the above query, Kilcher wrote:
 * * * The claimant could return to her former position of employment. Based solely upon the claimant's psychological condition and Dr. Greer's opinion, the following jobs would be appropriate for the claimant:
 Collator Operator; Inserting Machine Operator; Microfilm Mounter; Postage Machine Operator.
 * * * Based solely upon the claimant's psychological condition and Dr. Greer's opinion, the following entry-level jobs would be suitable for the claimant in conjunction with on-the-job training.
 Teacher Aide; Bookmobile Driver; Route-Delivery Clerk; and, Weight Clerk.
6. The Kilcher report further states:
III. EFFECTS OF OTHER EMPLOYABILITY FACTORS
 Question: How, if at all, do[es] the claimant's age, education, work history or other factors (physical, psychological and sociological) effect her/her ability to meet basic demands of entry level occupations?
Answer:
 Age: The claimant is 52 years of age and this would be detrimental in her ability to be employed when taking into consideration all of the vocationally significant factors which I have identified throughout this report. Although the claimant would not be qualified to participate in a formal retraining program based upon her age, she would have the ability to meet the basic demands of entry-level occupations through an on-the-job training program which would be within her reduced Residual Functional Capacity.
 Education: The claimant reported that she completed the 10th grade of school and she did not obtain a GED, nor did she complete any type of vocational or technical training with the exception of that which she acquired on the job. She can read, write, and do basic math. Considering these factors, the claimant would not be qualified to participate in a formal retraining program but she would be qualified for entry-level jobs through on-the-job training that would be within her reduced Residual Functional Capacity.
 Work History: The claimant was employed as a Machine Operator and Glove Inspector which are classified as "Semi-skilled." Based upon the claimant's past work history, she would have the ability to perform entry-level jobs through on-the-job training that would be within her reduced Residual Functional Capacity; however, she would not have acquired any transferable skills for a job she could physically perform.
* * *
 Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
 Answer: The claimant is 52 years of age, has a 10th
grade education and she did not obtain a GED, nor did she complete vocational or technical training. She can read, write and do basic math. She was employed as a Machine Operator and Glove Inspector which are classified as "Semi-skilled"; however, she would not have acquired any transferable skills. Based upon these factors, the claimant could perform entry-level jobs that would be within her reduced Residual Functional. When taking into consideration her age and limited education, she could not be retrained for a job that would be within her reduced residual functional capacity.
7. In further support of her PTD application, relator submitted a vocational report from Julie Morrissey dated January 22, 2001. The Morrissey report states in part:
 Mrs. Searles is significantly vocationally disabled. She has performed 1 unskilled job and 1 marginally semi-skilled job offering no marketable transferable skills to alternate [sic] work. The claimant's treating Psychologist has opined her incapable of any substantial work even though a consulting Psychologist (Dr. Greer) who only saw Mrs. Searles 1 time, opined her capable of past work and other work. Mrs. Searles was noted as being treated by Dr. Hunt on a regular basis until she was declared MMI in 1998.
 Physically Mrs. Searles has been reduced to a maximum of a restricted range of sedentary work by Dr. Rutherford. The doctor's limitations of only occasionally handling objects with her right upper extremity would severely reduce a sedentary unskilled work base. Such jobs are mostly assembly and/or inspecting occupations or small machine operations requiring frequent to constant use of both upper extremities to successfully perform the work and maintain production requirements. Other sedentary jobs not requiring such handling abilities more that occasionally would be mostly clerical in nature and very limited in numbers. Access to such jobs would be hindered significantly due to Mrs. Searles' limited education. Such jobs would require a high school diploma at a minimum.
 Based on Mrs. Searles' approaching middle age, limited education, and reduced physical and mental functional capacities she is not a candidate for significant numbers of jobs existing either locally, regionally or nationally.
8. Following a March 13, 2001 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order states in part:
 The Staff Hearing Officer relies upon the persuasive reports dated 11/30/2000 and 12/08/2000 that were prepared by Industrial Commission Psychologist Dr. Earl Greer and Industrial Commission Orthopedist Dr. James Rutherford.
 The claimant was injured on 11/10/1992 while performing assembly work as a plastic worker which required repetitive movement of running pieces through the machine, using a knife and cutters to trim the plastic. The claimant was 44 years of age at the time of this industrial injury. The claimant worked as a plastics worker approximately five months, since 06/1992. The claimant previously worked as a factory worker for a uniform company beginning in February of 1992 and worked there (for three months) until June of 1992. Prior to working outside the home in 03/1992, the claimant had been a homemaker since 1964 when she left school. The claimant worked until 12/04/1992, when she stopped working after an examination by Dr. Sharon McQuillian.
 The claim was originally recognized for right carpal tunnel syndrome and cervical strain. On 12/30/1994, the claim was additionally recognized for right lateral epicondylitis. In 1996, the claim was additionally recognized for major depression, severe, without psychotic features. The claimant has received only conservative treatment for the allowed conditions. The claimant currently sees Dr. Lake monthly for treatment of the physical allowances of this claim and sees Dr. Hunt monthly for psychotherapy. According to the claimant's testimony at hearing, she currently wears a right wrist and elbow brace and takes approximately four prescription medications.
 The claimant continued to work following her industrial injury through 12/03/1992. The claimant has not worked at all since 12/3/92. The claimant received temporary total disability compensation from 12/04/1992 through 02/02/1998, date of a District Hearing Officer hearing.
* * *
 The Staff Hearing Officer finds the claimant's residual functional capacity related to the allowances (physical and psychological) does not prevent the claimant from performing sedentary, entry level, or unskilled positions.
 The Staff Hearing Officer notes the Employability Assessment Report dated 01/20/2001 and prepared by Industrial Commission Vocational Expert John Kilcher. He supports the conclusion that based on the persuasive reports of Dr. Rutherford and Dr. Greer that the claimant retains the residual functional capacities to perform sustained remunerative employment consistent with a number of job titles.
 The job titles that were identified by the Vocational Expert as being current employment options for the claimant included: surveillance system monitor, food and beverage order clerk, call-out operator, telephone quotation clerk, collator operator, inserting machine operator, microfilm monitor, postage machine operator. With on-the-job training, the claimant would be suitable to work as a teacher's aide, bookmobile driver, route-delivery clerk, weight clerk, appointment clerk monitor, credit authorizer, credit card control clerk.
 The Staff Hearing Officer agrees. The residual functional capacities as set forth in the above persuasive medical reports clearly would not physically and psychologically prevent the claimant from engaging in sustained remunerative employment consistent with the job titles identified by the Vocational Expert as being current employment options.
 The claimant indicated at hearing that she is currently approximately 52 years of age. The Staff Hearing Officer finds that the claimant's age is overall viewed as a positive vocational asset. The claimant's age in and of itself clearly would not prevent the claimant from obtaining and performing sustained remunerative employment consistent with the jobs identified by the Vocational Expert a[s] being current employment options.
 The claimant indicated at hearing that she has completed approximately the tenth grade of education as she left school in order to get married. The claimant also indicated that she is able to read, write, and perform math. The claimant was a housewife for approximately 27 years before she entered the work force in 1992. Despite the lack of a high school education, the lack of a GED, and the lack of prior employment experiences, the claimant was able to successfully find and maintain two semi-skilled employment positions. The claimant first obtained a job (in 1992) as a factory worker, and then as a machine operator/plastic worker; both positions are considered semi-skilled positions according to Mr. Kilcher. The claimant has an average learning ability according to Mr. Kilcher. The Staff Hearing Officer finds that the claimant's average general learning ability, ability to learn new skills (as demonstrated by her acquisition of employment after being out of the work force for at least 27 years), in combination with her ability to read, write, and to perform basic math, would assist the claimant in obtaining and performing the entry-level, unskilled types of employment, which have been identified by the Vocational Expert as being current employment options within her residual functional capacity.
 The Staff Hearing Officer notes that the claimant was 44 years of age (a younger person) when she last worked in 12/1992; the claimant did not seek rehabilitation, nor retraining, and currently elects not to participate in rehabilitation according to her IC-2 application. The Staff Hearing Officer notes Dr. McQuillian, the claimant's former physician of record, indicated on past C-84s the claimant should be evaluated for rehabilitation (C-84s dated 01/19/1993, 04/29/1993, and 06/03/1993). Per a 12/02/1993 BWC exam of Dr. Zellers, the claimant will require formal rehabilitation and may require a job modification assistance or vocational services assistance in an effort to return to the work force. On 03/14/1994, the BWC Rehabilitation Department sent a letter to the claimant requesting her to contact them by 03/28/1994 if she was interested in rehabilitation services. The claimant's rehabilitation file was closed on 03/28/1994 due to Dr. Hunt's (the treating psychologist) progress notes that the claimant was not medically stable to participate in an active rehabilitation program. Since 1994, there has been no contact with the Rehabilitation Department.
 The Commission may consider not only past employment skills but those skills which may be reasonably developed, and may consider the failure of a claimant to undergo rehabilitation or retraining that would permit the claimant's return to work. State ex rel. Speelman v. Indus. Comm. (1992), 73 O. App.3d 757. The Commission must consider potential skills which can be developed. A claimant's lack of participation in retraining does not necessarily translate into an inability to be retrained. The existence or lack thereof, of expert evidence as to the claimant's ability to participate in medical and/or vocational rehabilitation is relevant. An award of permanent total disability compensation should be reserved for the most severely disabled workers and should be allowed only when there is no possibility for reemployment. State ex rel. B.F. Goodrich Co. v. Indus. Comm. (1995), 73 Ohio St.3d 525.
 Based on a careful consideration of the above, as well as all of the evidence in the claim file and at hearing, the Staff Hearing Officer concludes that the claimant is capable of performing sustained remunerative employment consistent with the job titles identified by the Vocational Expert as being current employment options. Therefore, the claimant is not permanently totally disabled.
9. On August 21, 2001, relator, Wanda Searles, filed this mandamus action.
Conclusions of Law:
It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
Analysis begins with a brief overview of the commission's order.
For its threshold medical determination, the commission relied upon the reports of Dr. Rutherford and Mr. Greer. From these reports, the commission concluded that relator is medically able to perform sedentary employment. Neither the commission's threshold medical determination that relator can perform sedentary employment, nor the reports upon which the commission relied to support this determination are under challenge in this action. However, relator does challenge the commission's nonmedical analysis.
The commission, through its SHO, engaged in its own analysis of the nonmedical factors. However, it found parts of the Kilcher report useful and persuasive without adopting the entire report. The commission agreed with Kilcher's identification of specific employment options relating to the reports of Dr. Rutherford and Mr. Greer.
The commission discussed relator's age of fifty-two years and found her age to be a positive vocational asset.
The commission discussed relator's tenth grade education and her ability to read, write, and perform basic math. The commission noted that relator had been a housewife for approximately twenty-seven years yet successfully entered the work force in 1992, despite her lack of a high school education, lack of a GED, and lack of prior employment experiences. She subsequently held two semi-skilled jobs. The commission found that this evidenced to an "ability to learn new skills."
The commission agreed with Kilcher's assessment that relator has an average learning ability.
The commission found that relator's average learning ability, ability to learn new skills and her ability to read, write and perform basic math would assist her in obtaining and performing the entry-level unskilled types of employment identified by Kilcher in his report.
The commission's nonmedical analysis continues with a determination of what efforts relator made toward rehabilitation and retraining. The commission found that medical records dating back to 1993 indicate that relator should be evaluated for rehabilitation. The commission then notes that on March 28, 1994, the rehabilitation file was closed due to the treating psychologist's progress notes indicating that relator was not medically stable to participate in an active rehabilitation program. The commission then indicates that the failure to undergo rehabilitation in 1994 was viewed as weighing against PTD in the determination of the merits of the application.
The commission's order suggests that the rehabilitation determination was an inseparable part of its nonmedical analysis. That is, the commission's order does not indicate that the rehabilitation determination is a separate basis for denial of PTD. Compare State ex rel. Kilgore v. Indus. Comm. (Mar. 30, 2000), Franklin App. No. 99AP-503, unreported. (The sole nonmedical basis for denial of PTD compensation was the finding that Georgia Kilgore had failed to present any evidence that she ever sought rehabilitation, retraining or remediation after her second surgery when she was only fifty-one years of age despite medical evidence that she was medically able to perform sustained remunerative employment.)
The magistrate finds that the commission abused its discretion with respect to its rehabilitation determination and, consequently, this court must view the commission's entire nonmedical analysis as flawed.
The Supreme Court of Ohio has repeatedly held that a claimant's failure to undergo rehabilitation or retraining can be a factor for the commission's consideration in a PTD adjudication. State ex rel. Wilson v. Indus. Comm. (1997), 80 Ohio St.3d 250; State ex rel. Wood v. Indus. Comm. (1997), 78 Ohio St.3d 414; State ex rel. Bowling v. National Can Corp. (1996), 77 Ohio St.3d 148.
The Wilson court states:
 We view permanent total disability compensation as compensation of last resort, to be awarded only when all reasonable avenues of accomplishing a return to sustained remunerative employment have failed. Thus, it is not unreasonable to expect a claimant to participate in return-to-work efforts to the best of his or her abilities or to take the initiative to improve reemployment potential. While extenuating circumstances can excuse a claimant's nonparticipation in reeducation or retraining efforts, claimants should no longer assume that a participatory role, or lack thereof, will go unscrutinized. [Id. at 253-254.]
The Wilson court thus recognized that extenuating circumstances can excuse a claimant's nonparticipation in rehabilitation or retraining.
In this case, the commission's order finds that relator's rehabilitation file was closed on March 28, 1994, due to Dr. Hunt's progress notes stating that relator was not medically stable to participate in an active rehabilitation program. While this finding, on its face, strongly suggests that relator had a valid excuse for nonparticipation, the commission, nevertheless, treats the finding of nonparticipation as a factor weighing against PTD without explaining why this is so.
The commission's order seems to incorrectly suggest that nonparticipation must be viewed as a factor weighing against PTD regardless of the claimant's actual medical ability to participate in rehabilitation.
The commission's order does mention that, since 1994, there has been no contact with the rehabilitation department, thus suggesting that relator may be held accountable for nonparticipation at some point after the March 1994 file closure. However, there is no actual commission finding of unexcused nonparticipation since 1994, and the commission's order cites to no evidence in this regard. Accordingly, this court cannot uphold the order on the basis that the failure of rehabilitation might have occurred since 1994.
In short, the commission's findings regarding the March 28, 1994 rehabilitation file closure do not support the commission's conclusion that nonparticipation in rehabilitation is a factor weighing against the granting of the PTD application. The commission's nonmedical analysis appears to be premised in part upon a finding that constitutes an abuse of discretion and, thus, cannot stand.
Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying relator's application for PTD compensation, and, in a manner consistent with this magistrate's decision, enter a new order either granting or denying the PTD application.